The next matter, number 25-1231, Michael Bronson v. Town of South Kingstown et al. At this time, would counsel for appellant please introduce himself on the record to begin. Good afternoon. May it please the court, my name is John Donovan and I represent Michael Bronson in this case. I'd like to request one minute of rebuttal if possible. Yes. The trial court erred in this case when it entered summary judgment in favor of the Town of South Kingston. The court improperly resolved, I think what could be said, almost every factual question in favor of the Town and did not view the evidence in light most favorable of my client. I'd like to key on, if I could, three issues in the case that we say reversible error occurred. First, we say the court wrongly concluded that Bronson's January 2019 report, his first report of misconduct, was not protected by the Rhode Island Whistleblowers Prevention Act. Secondly, we say the court erred in concluding that his second report in July of 2019 did not result in material adverse actions taken against him. And lastly, we say the court erred as a matter of law when it said that there was no violation of substantive due process. With respect to the first issue, Mr. Bronson reported safety issues and also alleged sexual harassment occurring. Can I specifically ask you about that issue and maybe focus in more directly on the case law that should guide us? Sure. So, a plaintiff, to be a whistleblower, you have to allege a law that is being broken. And you have to know or think that at the time you're making that complaint, there are some violations of law. Is there Rhode Island law on the point of how particularly that has to be pled and established at summary judgment? Because, of course, the district court here said, well, you know, he did, he made a complaint at the time, but it didn't rise to the level of saying, like, hey, laws are being broken here. You need to react. And the short answer is no. The case law in Rhode Island, much like on many issues, is not very well developed on that specific point. What is the level of specificity that's required? What we have here, as Your Honor mentioned, is you have to either know or reasonably believe that someone's violated the law. What he or a law rule promulgated rule or law. Here, what he alleged was, what we say, Your Honor, is that he alleged not only was this fellow Orton violating rules of the department, not showing up on time, things of that sort, but he also alleged what was sexual harassment, which under any set of rules, under any law, sexual harassment is going to rise to the level of, if proven, not only state but federal law. So I do see that you say that now.  But our lens and the district court's lens, I think, has to be at the time that original complaint was made, what was happening. One other thing that I was sort of thinking about here is that report, your client didn't go and report and say, hey, I need to make a report. There's some problems going on. He was sort of asked in passing by his supervisor, how are things working out? That's right. Does that figure into our analysis as well? I don't think so. I think the statute talks about a report. I don't know that it matters how that report comes about, Your Honor. And I think we fall within, arguably, the purpose of the statute, which, of course, is we want to promote people promptly reporting dangerous or unsafe situations in a workplace, and then protect them when they do make that report from retaliation. And here, I think Your Honor is 100% correct. He's asked by another supervisor, tell us how things are going, and that opens the door for the report. But in terms of what evidence was before the trial court in this case, they, of course, had our complaint in which we allege that there were allegations of violations of rules and conduct that rose to the level of sexual harassment. But more than that, and this is in the appendix beginning at page 85, are answers to interrogatories where we were asked very specific questions. What are you alleging was the violation of law? What did you report? Go on and on to talk about how we reported sexual harassment. That's on page 91 of the appendix. How we reported violations of rules, including his inability to show up on time, not follow direction. So I think, Your Honor— You're quoting from your client's answers to the opposing party's interrogatories. I am, which were part of the summary judgment record before the court. Admittedly, Your Honor, our opposition was, in terms of this specific issue, was brief. But we do allege, and we did allege in that opposition, that we had reported violations of laws, rules, or other similar things. And then in the record before him, he did have those answers to interrogatories. They were part of the record. Rhode Island law seems to be that your complaint doesn't need to identify the statutes or regulations. But when you get to summary judgment at that time, you need to point to some statute or regulation. Am I reading Rhode Island law correctly? I think you are, in part, and maybe not in part. I would say to you, the first part of your question is 100% correct, Your Honor. On the second part, I think it's an open question about whether at summary judgment you have to then go through and say, well, they violated the Rhode Island Fair Employment Practices Act, for example, which outlaws sexual harassment, or you violated some rule of the department promulgated by a municipality. I don't know that the law says that. I know Judge McConnell says that in his decision, but I'm not sure there's a Rhode Island appellate court case that says the standard that he held us to. I don't believe there is. Counsel, the dramatic incident where Lieutenant Orton points a gun at your client, that followed what we're characterizing as the verbal complaint where your client described he's coming late to work, he's not wearing the proper garb when he's out on duty, he is harassing the dispatcher. The lieutenant was reacting to all of those verbal complaints when he pointed the gun at him. Is that correct? That's our position, Your Honor, and that's the beginning of this retaliation that we say is violative of the act. Now, on that issue, Your Honor, we in the trial court, what they did is they looked at each and every discrete allegation we made of retaliation, and they looked at them in isolation. They said, well, when you were denied the training opportunities, that's not retaliatory. When you were denied or when you were given negative reviews, despite an unblemished record up until then. And the review, of course, ironically was you're not good at following commands or adhering to the chain of command when his head officer is pointing a loaded gun at him during a roll call. All of those things Judge McConnell suggested didn't rise to the level of retaliatory conduct. Our position is, if you're reviewing the case in a light most favorable to us, and consistent with decisions in this arena, you have to look at the cumulative effect of these things. You can't just say, I'm going to cherry pick. So I agree with you, and I think that's what Burlington Northern says. But each or some of the instances you allege have to have tangible consequences, right? Yes. That are materially adverse. So, I mean, I think what the district court did here was went through them individually and said, well, there's no tangible consequence to any of these. None of these are materially adverse. So whether you looked at them individually or cumulatively, they still added up to zero. But let's say maybe that was wrong. What do you point to of those that did have tangible consequences? Sure, Your Honor. Please. So in terms of tangible consequences, I'd say the biggest one, of course, is the negative reviews, which, of course, he had never had before, and then the denial of promotional opportunity. Weren't those reversed? I'm sorry? I thought you reversed the negative reviews. Well, that came later, and I think with an amendment. But not the review where they allege that he didn't report the gun incident promptly. I don't think that was ever reversed. Okay. And I think, Your Honor, I'm sorry. I thought the other finding as to that one was that reprimands aren't material if they don't carry a consequence. So if it's simply a reprimand, it just doesn't count. That's what Judge McConnell says, but I think it ignores the practicality here. You've got somebody whose lifelong career is to be a police officer. He wants to move up the chain of command. The idea that a negative review doesn't have any type of consequences for somebody, I think it just ignores the reality, which is he's in the office, he's trying to get promotions to the traffic position, and they're giving him negative reviews. More than that, they're disparaging him. That's our allegation, is that there's disparagement from both of these folks. So I think- Well, I don't know. I mean, it just seems a little ironic that he reports him in January of 2019, then word is leaked to this fellow, and he points a gun at him, and then we're getting reprimanded for not reporting that timely. I'm not sure, Your Honor, if I would say, no, he shouldn't have been maybe discussed, or it shouldn't have been discussed or counseled on it, but a formal reprimand when you're allowing what I'll call the assailant to run roughshod over my client and his rights, I think it's just a little-it just goes to the whole level of retaliation. Counsel, maybe this is something that opposing counsel will have to address.  And I think you cite this in your brief. There does seem to be some confusion in the district court's opinion about what you have to show to establish that the employer engaged in a materially adverse action. The district court does make the point that it's an objective standard. Would the action at issue dissuade a reasonable employee from reporting the conduct at issue? That's an objective standard. But then you go through a little further on, and the court seems to turn it into a subjective standard. I mean, for example, Sergeant Bronson falls short on illustrating that the denied training request caused significant harm to him. Right. That's wrong, I think. I mean, that-although he cites the objective standard, he seems to turn it into a subjective inquiry, and that's just not right. I agree with you, Your Honor. I think it is objective, and he does go through each of them. And to a question earlier about, well, he reviewed all of them. He never addressed the question, which I think is the state of the law, that you've got to look at the cumulative effect. I don't think he said anything about the cumulative or collective effect, which the Billings case talks about, albeit in a different context under Title VII. But we're talking about retaliation. But to your question, Your Honor, I think it just common sense would say at a summary judgment stage, how is a judge making these determinations that objectively this type of conduct, pulling a gun out on him, mimicking the gun when he comes back, denial of training opportunities, reprimands, all these things were not materially adverse? It seems to me that's a question of fact that would be best laid to the jury. Well, the district court didn't hold that the gun was materially adverse. I thought it held that the January 19 report was not a triggering report, and hence there's no-you don't even get to, was the retaliation. You're right. There's two issues, right? The first report in January, the verbal report where he's asked by his supervisor. Then as it relates to the second report, the untimely one relating to the gun incident, that happens in July. The court doesn't say there that it's not protective activity. What they key on as it relates to all of the ensuing retaliation after the gun incident is they say it's not materially adverse. Right. So the gun incident can serve as a finding for retaliation only if we find the January report was a protected report. Yes. As to the first report, remember there's a second written report, and we say that also could be a separate basis for all the retaliation that followed. But the second written report is after the incident. After the gun incident, right. But before we say he's retaliated against continuing disparagement, negative reviews, things of that sort. And I'm not sure I saw in your brief any explanation for retaliation by the officer. Was it Orton? Orton it was, Your Honor. Yes. Was retaliation attributed to the defendants? I think in our answer to in our complaint, we talk about in paragraph 32 ongoing harassment by Lieutenant Orton. And then in our answers to interrogatories, we repeat that as well in terms of saying there was disparaging comments made by him in retaliation to both of our reports. Right. But what makes the defendants liable for Orton's retaliation? Right. Well, I think we're not only saying that Orton did it, but we're saying that Mr. Bucco did it as well. And I think they would be liable under the act. But take you're certainly including with respect to your January verbal and written report. That's right. You are claiming those are protected activity. We are claiming that part of the retaliation was the gun against the head. That's correct, Your Honor. What makes the defendants liable for the gun against the head? I think under the act, under the Whistleblowers Act, there was a scheme where the person to whom we reported it to, Bucco, tells Detective Orton about it. And what would one expect? But somebody's going to use that against us. And there was no effort by the town to prevent or rein him in. In fact, things got worse for us after the report. So are you arguing the town is vicariously liable for Orton's gun threat? Under the Whistleblower Act, I think we are, yes. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the record to begin? Good afternoon, Your Honors. Mark Reynolds for the town of South Kingstown. Robert Czarnecki and Amy Reiner. May it please the Court. I want to address what has been referred to as the reprimand by Major Bucco. It really wasn't a reprimand. What happened was Sergeant Bronson's evaluation was performed by his immediate supervisor, and it's part of the process that then goes to the command staff, who was Major Bucco and Chief Gaber. They have an opportunity to provide their own comments on the evaluation. So what they did is they provided comments saying, we disagree with the ratings that this officer was given because he delayed in reporting a very serious incident where someone supposedly drew a gun and pointed it at him. So it wasn't even a reprimand in the form of this is going in your personnel file and we're reprimanding you for not reporting. It was just an addendum to his evaluation, which criticized him for not reporting in a timely manner the fact that another officer had pointed a gun at him. That sounds even worse than a reprimand. Well, I don't know that it is. I mean, it's not. To have in your personnel file a job assessment or criticized by the senior officers as opposed to a verbal reprimand that appears nowhere in your file? Well, it would either be a written reprimand because it was in writing or it's a written part of the evaluation. I'm not trying to split hairs. It was in writing and it's part of his evaluation, but it wasn't disciplinary in nature. I take it you agree that reporting the gun threat was protected activity. Yes. Once he reports the gun threat in July of 2019, yes, he's reporting criminal activity. He didn't need to cite the criminal code. He just needed to report the gun threat. Correct. And he was asked, do you want to press charges? And so he clearly understood. He said I don't want to press charges, but he understood that that was a criminal act. So with respect to the gun threat, we've got the protected activity. The question is, was there retaliation? With respect to the post-gun threat denial of the, what is it, IOD benefits? Correct. I understand the December request for IOD benefits was denied because it was missing a physician's sufficient evaluation, but that that was then supplemented in February, I believe it was, with a physician's report, and yet the town continued to deny the IOD benefits, and he didn't get them until finally an arbitrator said that he should get them. Have I got the chronology right? Not exactly right, Your Honor. There were two IOD claims, and the plaintiff tried to mesh them together. There was an IOD claim in December of 2019 which the town denied because it wasn't provided with sufficient documentation from the physician tying his absence from work to duty. Subsequent to that, in February, Sergeant Bronson provided a note from his doctor saying it was duty-related. By February of 2020, he had already come back to work. He had been back to work since January of 2020. So that's IOD claim number one, which was denied. He supplemented in February and cured the issue. He's then back to work in January of 2020. In August of 2020, he goes out of work again claiming that he has stress from everything that's been happening to him. He tries to point back to the gun incident with Lieutenant Orton. That claim was contested, and he did go to arbitration in order to obtain those benefits, but it's not a continuation of the December 2019 claim. So you're saying the December claim was denied rightly because of the lack of a physician's report. When the physician's report was provided in February, the question was moot because he'd been back to work, and it didn't arise until there was a new request in August. Correct. Okay. Right, right. I'd also like to go back to the gene. If the district court was wrong about the initial oral report and that that did constitute projected activity, then the later incident with the gun, do you agree that that is retaliation such that the defendants are on the hook? An interesting question because under the whistleblower statute, it's the employer that's liable. Lieutenant Orton was technically a superior to Sergeant Bronson. He was the superior officer on that shift. He was a supervisor on that shift. So whether that would be considered an act by the employer against Sergeant Bronson, obviously that wasn't briefed. The district court didn't get to that issue, whether that would be considered retaliation by the employer because it was, we would say, a rogue act by an employee who did happen to be a supervisor. So I do think that's an open question that the court didn't address and it wasn't briefed. But with respect to that gene, what were the consequences for Lieutenant Orton of pulling the gun? What happened to him? Sure, so as soon as it was reported in July, he was placed on administrative leave pending an internal investigation. At the end of that internal investigation, the chief decided that he was going to send him for a fitness for duty evaluation by a psychiatrist, psychologist, and would not be returned to duty until he had successfully been deemed fit for duty. Lieutenant Orton obtained that certification. He was prepared to return to duty in November of 2020, I believe it was, November of that same year. So July to November, he's out. When it's learned that he's coming back to duty in November, the dispatcher who was involved in the previous report makes a formal complaint to the town in December, bringing forward various allegations against Lieutenant Orton. He's again immediately placed on administrative leave, and while that investigation was pending, he resigned. So that's the full chronology of what happened from the time. So from the time, essentially from the time it was reported that he had pulled the gun on Sergeant Bronson, he was on administrative leave until he retired, but for that very brief period of time when he was coming back before the second complaint was made by another person. So all of that history, suggesting that the department was quite proactive in dealing with Lieutenant Orton, you would argue that that, focusing on the town, the police department as the employer, that they were not engaged in any retaliatory activity because they took these complaints so seriously and attempted to deal with them. Would that be your argument? They acted, the employer, again getting back to the employer, the employer acted on the complaint once, or the knowledge, and that was the first knowledge that they had of that incident, and so yes, that goes toward the argument that the pointing of the gun was not by the employer because they certainly didn't condone it, and when they first learned of it, they acted on it. And I, is there another question? I didn't mean to interrupt you if you want to finish. No, I was just going to, I did want to briefly address the January 2019 report as to why I don't think it applies, and I think it's important to look at the facts that were before Judge McConnell. How did Sergeant Bronson describe his report, both in his deposition and in his subsequent memo, and the things that he complained about, you know, Lieutenant Orton, he's late for work, he's showing up late and sometimes is therefore responding to calls without his uniform, he's becoming more angry with me, and the conduct with the dispatcher where he was getting close to her face and saying hi. In Sergeant Bronson's deposition, he described it as jokes that were going too far, and that's in appendix page 49. He referred to it as just really strange behavior, and that's, again, at that same portion of his deposition. Can you direct us to any law that would help us determine this question of how particular that needs to be applied? Because I do see your point that these are sort of just general complaints, but there's not a real big step between inappropriate behavior, strange physical nearness, and sexual harassment, right, which we all know is against the law. Right, but when he was asked about it, again, in his deposition, he didn't use the words, I felt she was being harassed because she was a woman, that he was harassing her. He didn't use those words. He used the words that I just gave you, really strange behavior, jokes that were going too far. Are there any cases on point that would help us decide this? Case law? Yeah. The only case, and Judge McConnell cited it and doesn't go into it in detail, is that Nissan versus Charter Care case, which is a Rhode Island Supreme Court case. It's cited in my brief. It's 306 Atlantic 3rd, 1026. It's a 2024 decision. I don't know that it goes into a lot of detail, but it does say that if the employee can't articulate how they reasonably believe the conduct was criminal, summary judgment is appropriate. And the other part of the record that I wanted to refer to, when Sergeant Bronson made his report in July, he wrote a memo. In that memo, he referenced the prior verbal report in January, and the way he characterized the issues that he reported in January were the issues were minor up to that point. So in his mind, what he reported in January was not criminal conduct, was not illegal conduct. It was inappropriate conduct. It was unprofessional conduct, but it wasn't illegal. Could you just quickly respond to the point that I raised with opposing counsel about what appears to be a legal error in the district court's analysis, that is the district court, in discussing what is a materially adverse action, correctly says it's an action that could well dissuade a reasonable worker from making or supporting their charge of discrimination objective standard. Then when he starts focusing on the specific adverse action that Sergeant Bronson cites, well, he doesn't show that it harmed him in any way. I mean, how do you reconcile that? Certainly that's not obviously an objective, but I think you still would have to show how would a denial of training dissuade me from reporting. And this denial was a – Well, that's not what he does. That's not the way he analyzes it. I agree that's not the way he analyzes it, but I think you can look at it as Sergeant Bronson didn't bring forth any evidence to indicate how the denial of this particular training would dissuade him or any other reasonable employee from reporting. And I think the important thing to remember, the denial was we have a scheduling issue when you want to take this training, and you should consider it at another time. That's what the form says. It's not just you can never do this or we're denying it. It was denied with a reasonable explanation based upon the staffing concerns at that particular time. If there are no other questions, thank you. Thank you, counsel. At this time, counsel, for the appellant, please reintroduce yourself on the record. You have a one-minute rebuttal. Good afternoon again. John Donovan for Mr. Bronson. Just to address the Nisenjan decision versus charter care, which I think was referenced in response to some questions, there the Supreme Court of Rhode Island did not talk about or specifically address the level of specificity required when you're reporting alleged violations of laws, regulations, or rules. They did address in that case whether anger issues would rise to that level and some illicit activities, but they did not talk about specifically what has to be alleged, other than to say that all you need is a reasonable belief that the conduct violated the law rather than knowledge that it was actually illegal. And on this point, I think the report in January of 2019 does talk about violations of rules, and it does talk about that, as we mentioned earlier, the sexual harassment or harassment. And much like they've conceded that the gun report, wherein we never cited any specific law that was violated when we reported the gun incident, I think the same standard has to apply with respect to the initial report. And lastly, I know my time is up, and you've been very patient, but lastly, on this issue of a material adverse action, again, the purpose of the statute in preventing retaliation is they're looking at whether the conduct of the employer or its agents would dissuade employees from making timely reports, dissuade employees from making timely reports. And I think when you look at the totality of these adverse actions that we've set forth in our brief, and you view it in the light most favorable to us, as Judge McConnell was obligated to do, summary judgment should not have entered, and there are absolutely questions of fact in this case. Thank you very much. Thank you. Thank you, counsel. That concludes argument in this case.